IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Civil No. 4:23-cv-433 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | VERIFIED COMPLAINT FOR |
| | ) | FORFEITURE IN REM |
| Approximately $667,875 in | ) | |
| U.S. Currency, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Plaintiff, United States of America hereby files and serves this Verified Complaint In Rem and alleges as follows:

## I.    THE NATURE OF THE ACTION

1.    This is an action to forfeit specific property (hereinafter referred to as the "Defendant Property") to the use and benefit of the United States of America ("Plaintiff") for involvement, as set forth below, in violations of 21 U.S.C. § 846 (attempt and conspiracy), and § 841(a)(1) (prohibited acts).

2.    The United States believes the Defendant Property is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6), as money or a thing of value furnished or intended to be furnished by a person in exchange for a controlled substance, in violation of subchapter I, Chapter 13, Title 21, United States Code, as proceeds traceable to such an exchange, and as money used or intended to be used to facilitate any violation of said subchapter.

## II.    THE DEFENDANT IN REM

3.    The Defendant Property is generally described as approximately $667,875 in U.S. currency seized on or about July 1, 2023, near Bondurant, Iowa. The Defendant Property is in the custody of the United States.

## III. JURISDICTION AND VENUE

4.    This Court has jurisdiction over this case, pursuant to 28 U.S.C. § 1345 (United States as plaintiff), as an action commenced by the United States of America, and pursuant to 28 U.S.C. § 1355(a) (Fine, penalty, or forfeiture), as an action for forfeiture.

5.    This Court has in rem jurisdiction and venue over the Defendant Property under 28 U.S.C. §§ 1355(b) and 1395(b) because some of the acts or omissions giving rise to the forfeiture occurred in this District and because the Defendant Property was seized from this District.

## IV. FACTS

### <u>Overview</u>

6.    The "Controlled Substances Act" was enacted by Congress as Title II of the "Comprehensive Drug Abuse Prevention and Control Act of 1970," Pub.L. No. 91-513, 84 Stat. 1236 (1970) (codified at 21 U.S.C. §§ 801-904).

7.    The   term "controlled substance" is defined in 21 U.S.C. § 802(6) to mean a drug or other substance, or immediate precursor, included in any of the five schedules of such substances set forth in subchapter I of Title 21, United States Code.

8.      Schedule I substances have a high potential for abuse, have no currently accepted medical use in treatment in the United States, and there is a lack of accepted safety for use of these controlled substances under medical supervision. 21 U.S.C. § 812(b)(l)(A) - (C).

9.      Marijuana is a Schedule I controlled substance.

10.     Only persons registered by the Attorney General of the United States, in accordance with rules and regulations promulgated by the Attorney General, may legally manufacture or distribute controlled substances. 21 U.S.C. § 822(a), (b).

11.     Under the Controlled Substances Act, it is unlawful to distribute, dispense, or possess with intent to distribute, a controlled substance, unless authorized by law to do so. 21 U.S.C. § 841(a)(l).

12.     Under the Controlled Substances Act, it is unlawful to conspire with others to violate its prohibitions. 21 U.S.C. § 846.

13.     Under the Controlled Substances Act, all moneys or things of value furnished or intended to be furnished by any person in an illegal exchange for a controlled substance, all proceeds traceable to such an exchange, and all moneys used or intended to be used to facilitate a violation of Subchapter I of the Controlled Substances Act, are subject to forfeiture to the United States and no property right shall exist in such property.

## Characteristics of Drug Traffickers

14.    It is common in the illegal drug trafficking trade in the United States for sellers and purchasers involved in such illegal transactions to conduct business in U.S. Currency rather than using traceable payment means, such as monetary instruments, electronic transfers, or credit cards, to avoid creating records of their activities that might be detected by law enforcement.

15.    It is a known practice of the illegal drug trafficking trade in the United States for drug dealers, and couriers of money derived from the illegal sale of controlled substances, to package drug money in vacuum-sealed bags in order to try and prevent others, including, but not limited to, law enforcement officers and drug-detection dogs, from smelling the odor of controlled substances that is often lingering on money derived from the illegal sale of controlled substances.

16.    A legitimate business-owner typically has no need to vacuum-seal bundles of U.S. Currency.

17.    People engaged in lending hundreds of thousands of dollars to a business in another state typically use financial institutions or monetary instruments to transfer and safeguard the funds involved and to protect against risk of loss.

18.    Legitimate business investors do not lend borrowers hundreds of thousands of dollars in business capital in cash, wrapped in whole or in part in vacuum-sealed bags.

19.     Legitimate business investors do not lend borrowers any substantial amount of investment capital without documenting the amount lent, having proper documentation in place, and obtaining some sort of collateral to protect their investment.

20.     Couriers of drug money generally do not transport it by airplane out of fear of the money being detected by the security screening process and by law enforcement, and, therefore, they most often transport drug money by automobile.

21.     Traffickers of illegal drugs and couriers of drug trafficking proceeds in the United States often travel or conduct drug-dealing activities in rented vehicles so that their personal vehicles cannot be readily tied to illegal drug-dealing activities.

22.     Traffickers of illegal drugs and couriers of drug trafficking proceeds in the United States often tell evasive, inconsistent stories about the origin of, and circumstances surrounding, large amounts of currency seized from them by law enforcement under suspicious circumstances, including, but not limited to, details about the trip or trips during which the money was seized, the source or sources of the currency, the purpose or purposes for the currency, the reason or reasons the money is being transported in cash instead of in the form of a monetary instrument or wire transfer, the reasons or reasons why the seized currency is wrapped in a manner indicative of a connection to illegal drug-dealing, and even the specific amounts involved.

23.     The United States believes that evidence will show after a reasonable opportunity for further investigation and discovery, that the Defendant Property

constitutes the proceeds of one or more prohibited controlled substance offenses or was used or intended to be used to facilitate one or more prohibited controlled substance offense.

### The Start of the Investigation

24.    On July 1, 2023, at approximately 5:23 p.m. a Polk County, Iowa Deputy Sheriff (hereinafter the "Deputy") saw a vehicle (a white Jeep Cherokee) parked on the shoulder of the road near Bondurant, Iowa that had its hazard or emergency lights turned on.

25.    The Deputy pulled behind the vehicle to render assistance, with his front emergency lights off, and his rear emergency lights on to warn traffic coming up behind his vehicle.

26.    Many of the Deputy's actions and his interactions with the driver were video recorded, and this Complaint contains a summary of what transpired and, at times, verbatim quotes from their conversations.

27.    The Deputy got out of his patrol car and contacted the driver of the vehicle, Megan Jane Hazen (hereinafter "Hazen"), who was still inside the vehicle.

28.    Hazen, then age 30, resided in Los Angeles, California, and was driving a rental car.

29.    Hazen told the Deputy she had stopped to check her telephone.

30.    From the Deputy's position by the open passenger's side window, he smelled the odor of marijuana coming from inside the vehicle.

31.     When Hazen was asked if there was any marijuana in the vehicle, she initially falsely denied it.

32.     Hazen then admitted she might have a joint with her.

33.     Hazen stated she wasn't smoking at all.

34.     Hazen was asked for her license, which she provided.

35.     Hazen eventually said she might have a vape pen with THC.

36.     Hazen told the Deputy he would find nothing else in her vehicle.

37.     Hazen said she was from California, coming from Minneapolis, and going to Omaha, having passed through Cedar Rapids.

38.     When Hazen was asked to step out of the vehicle, she started pulling items out of various areas of the vehicle. From the center console, Hazen pulled out a black bag with two (2) plastic tubes containing marijuana, and she grabbed a white plastic tube containing marijuana. From the passenger seat, Hazen pulled out a glass bong.

39.     The Deputy told Hazen to stop pulling things out and to exit the vehicle.

40.     Hazen denied having any guns or knives in the vehicle.

41.     Hazen was asked to sit in the Deputy's patrol car and the Deputy continued to talk to her about the illegality of marijuana possession in Iowa.

42.     The Deputy asked Hazen what else he would find in the vehicle, and she said, "just the weed."

43.     Hazen claimed she had been in Cedar Rapids, Iowa seeing an old high school friend, and they had met at a Bruegger's Bagels for lunch. She did not mention a business meeting or meeting a business colleague.

44.     When the Deputy asked Hazen how many times she had taken hits of marijuana, she said, "I just hit it," and added that she took hits when she stopped, that she had taken hits "maybe a couple of times every hour," and that she had taken one after she stopped by the road near Bondurant.

45.     The Deputy subsequently searched the vehicle, based on the probable cause he had developed that the vehicle was involved in illegal activity and that evidence of the illegal activity was likely inside.

46.     In addition to the drug-related items previously discussed herein, the Deputy found a red Lululemon bag with a brown Target bag inside. The Target bag had a plastic bag inside, which contained a large amount of money in the form of U.S. currency, which is part of the Defendant Property.

47.     The Deputy returned to his patrol car and asked Hazen about the bag of money.

48.     Hazen told the Deputy that she had been given the money by a family member to buy a new car.

49.     Hazen was unable or unwilling to provide the Deputy with the nature of her family relationship to the person who supposedly gave her the money nor was she willing or able to provide the Deputy with the name of the family member.

50.     Hazen then claimed she was given the money by someone with whom she was so close that she considered the person to be a family member.

51.     Hazen then told the Deputy the money was given to her as an investment in her business.

52.     Hazen eventually claimed she received the money from a friend in Cedar Rapids named Alexa, but was unable or unwilling to provide the Deputy with Alexa's last name.

53.     Hazen then claimed she received the money from a man named "Keith," who is/was married to Alexa.

54.     Hazen claimed Keith owns/owned numerous businesses, but she could not provide any details about them.

55.     Hazen was unable or unwilling to state Keith's last name.

56.     Hazen could not or would not tell the Deputy how much money she had allegedly been given by Keith and was transporting via car from Iowa to California.

57.     Hazen then told the Deputy she was looking into buying a Mercedes.

58.     The Deputy returned to the vehicle and resumed his search.

59.     In the back of the vehicle, the Deputy found two (2) more bags containing large amounts of cash.

60.     In one suitcase the Deputy found, among other things, a blue vacuum pump and a reusable vacuum bag.

61.     Inside the vacuum bag, wrapped in a towel and in a black garbage bag, was a large amount of cash in vacuum-sealed packaging.

62.     The same suitcase contained a white paper bag with another large amount of cash in vacuum-sealed packaging.

63.     The same white paper bag also contained another reusable vacuum-sealed bag containing a large amount of cash inside a towel.

64.     After the Deputy found the second bag of money, he handcuffed Hazen.

65.     Hazen spontaneously blurted, "I promise it's for the business."

66.     At one point, Hazen claimed the money was packaged as it was found so she could keep it organized.

67.     While most of the money was wrapped in plastic, some was contained in rubber bands, and some was loose within bags. The total amount of the money transported by Hazen from state-to-state, otherwise described herein as the Defendant Property, was as follows:

| Denomination | Number | Value |
|---|---|---|
| $1 bills | 75 | $75 |
| $5 bills | 82 | $410 |
| $10 bills | 1,112 | $11,120 |
| $20 bills | 22,921 | $458,420 |
| $50 bills | 1,229 | $61,450 |
| $100 bills | 1,364 | $136,400 |
| Total = $667,875 | | |

68.     After the Deputy returned to his patrol car and resumed speaking with Hazen, she said the money was from a man named "Kevin", not "Keith."

69.     Hazen reiterated the money was for her business.

70.     While seated in back of the patrol car, Hazen asked, "is there anything else I can help you with?"

71.     Hazen told the Deputy she flew into Chicago on June 30, 2023, and drove to Minneapolis to see one of her friends with a show in Minneapolis.

72.     Hazen was asked the name of her friend and she avoided answering the question.

73.     Hazen said the show was related to a group called "Something Dope for the People" that puts on concerts.

74.     When Hazen was asked who she was seeing she said it was an "open mic" event.

75.     While conversing with the Deputy, Hazen discussed receiving the funds from "Kyle", not "Kevin" or "Keith," as she had previously stated.

76.     Hazen was told she was not under arrest but was being detained for purpose of an investigation.

77.     At one point Hazen said if her lawyer wasn't present she wouldn't be able to answer any more questions. However, when the Deputy asked Hazen if she was invoking her *Miranda* rights and declining to answer any more questions or make any more statements, she replied, "I don't know how I can help you any further; I told you about my entire situation."

78.     A short time later, Hazen interjected, "If you guys want to cite me or give me a ticket, I understand."

79.     Hazen claimed to be opening a studio in downtown Los Angeles and said she needed the money to invest in it.

80.     Hazen later said, "if you guys confiscate it, confiscate it; if you're going to arrest me, arrest me."

81.     At approximately 6:28 p.m., Hazen said, "I'll sit here as long as you want me to."

82.     At approximately 6:29 p.m., Hazen stated, "if you have any more questions, I'll answer what I can, but at some point, I'll have to call my lawyer if you want to keep talking." Hazen then explained she meant after the Deputy took her in.

83.     Hazen and the Deputy engaged in small talk about a variety of matters.

84.     At approximately 7:14 p.m., Hazen expressed concern about law enforcement potentially announcing what she had in her vehicle over the police radio because she was concerned about her safety. Hazen stated people listen to what law enforcement broadcast on their radios. She said, "I just want to make sure that I'm safe."

## Hazen's Statements to the Detective

85.     At approximately 7:40 p.m., Hazen spoke with an Ankeny Police Department Detective who had come to the scene.

86.     Many of the Detective's interactions with Hazen were video recorded and this Complaint contains a summary of what transpired and, at times, verbatim quotes from their conversations.

87.     At approximately 7:41 p.m. Hazen was *Mirandized* by the Detective and she agreed to speak with him.

88.     Hazen said she was in the fashion business and her business was called "Vibes ATM" ("At the Moment").

89.     Hazen claimed she had been in business for a year to a year and a half, and sold screen printed tee shirts, along with some sweatpants and hoodies. She said she did her own screen printing in her apartment. Her customers were mostly over the internet. It was an online business, and she was investing in a studio location.

90.     Hazen said she advertised on Instagram and Tik Tok. She also sold her products at an open mic venue in Los Angeles called "Something Dope for the People."

91.     Hazen said she flew into Chicago to gather an investment from colleagues who had businesses such as automotive, restaurants, and retail.

92.     When Hazen was asked the name of the investor she shrugged her shoulders, declined to provide a name, and simply said, "a colleague."

93.     When Hazen was asked what the colleague's expectation was for his investment, she, again, shrugged her shoulders, paused, and said she wasn't sure what that has to do with anything.

94.     Hazen said, "we have contracts" and claimed that after she returned to Los Angeles and everything was accounted for, then the contract would be sent out.

95.     When Hazen was asked about the terms of the contract, she again shrugged her shoulders and shook her head side-to-side.

96.     When Hazen was asked about her specific agreement with her colleague, she proclaimed, "I don't think my agreement with him really has anything to do with this."

97.     When Hazen was asked how much her colleague had allegedly invested in her business, she said, "I'm not sure, I haven't accounted for it all, yet."

98.     When Hazen was asked if she left Chicago without knowing how much money was there, she said, "yep."

99.     When Hazen was asked if her colleague told her how much money he was allegedly giving her she replied, "nope."

100.    Hazen then claimed the amount of money was documented with her tax attorney.

101.    Hazen would not tell the Detective the name of the person who gave her the money and denied telling the Deputy she received it from "Kyle."

### Hazen's Interactions with DEA Officers

102.    At approximately 8:20 p.m., law enforcement officers with the U.S. Drug Enforcement Administration (hereinafter "DEA officers") questioned Hazen.[1]

103.    The DEA officers read Hazen her *Miranda* rights and she agreed to speak with them.

104.    Hazen told the DEA officers that she flew into Chicago from California the day before, on June 30, 2023, visited some friends in Chicago, who she would not name, drove to Minneapolis, Minnesota for an open mic event called "Something Dope

---

[1] Hazen was questioned by a DEA special agent and a task force officer, who are collectively referred to herein as "DEA Officers."

for the People," which Hazen claimed to be attending as a vendor, and then drove to Cedar Rapids, Iowa on July 1, 2023, where she picked up the money that was found in the vehicle.

105.    Hazen claimed an artist she knew was performing at a "Something Dope for the People" event in Minneapolis.

106.    Hazen claimed the purpose of the trip was to get an investment for her business.

107.    Hazen claimed she had been in business about a year and a half, and stated her business had an Internet site, "Vibesatm.com."

108.    Hazen said she did all of her own screen printing and was going to be investing in a studio and screen-printing equipment.

109.    Hazen told the DEA officers she arrived at her hotel in Minneapolis around 11:30 p.m. on June 30, 2023.

110.    Hazen would not or could not name the colleague she allegedly travelled to Cedar Rapids, Iowa to meet for lunch and from whom she allegedly obtained the Defendant Property.

111.    Hazen claimed her friend was a "business associate."

112.    Hazen appeared to be generally familiar with the process by which law enforcement seizes money suspected of being drug proceeds, as shown at approximately 8:24 p.m. when she made the spontaneous comment to the DEA officers that, "if you guys want to seize it, we're just gonna file, do the paperwork back."

113.   When Hazen was asked if she was provided any paperwork for the money, she said, "I'm trusted."

114.   Hazen said the money would be counted by her tax accountant when she returned to Los Angeles.

115.   Hazen repeatedly told the DEA officers she had no idea how much money she was transporting.

116.   Hazen said paperwork would be sent between "our tax accountants."

117.   Hazen said she had no idea why she was not provided a check or wire transfer.

118.   Hazen said she had no idea what she would do if she was robbed while transporting the money.

119.   Hazen said she had no contact information for the person who gave her the money and then suggested she did but declined to let DEA call the colleague. When DEA officers asked if Hazen had come out here before she told them, "It was a one-time thing."

120.   At one point, Hazen estimated the amount of the money at around $400,000.

121.   Hazen told the DEA officers that she was going to drive from Cedar Rapids to Omaha, Nebraska, spend the night, and then drive home to California. However, Hazen returned the rented vehicle she was driving in Omaha, Nebraska on July 2, 2023.

122. After 9:10 p.m., Hazen was taken by law enforcement to the Polk County jail to be booked on drug charges.

123. Hazen was charged with possession of drug paraphernalia, possession of marijuana, and possession of a cannabidiol.

124. The charges against Hazen were dismissed on motion of the Polk County Attorney in August 2023 after Hazen successfully completed the requirements of the Polk County Attorney's Office Marijuana Diversion Program.

### **Hazen's Final Conversation with the Deputy**

125. After Hazen was booked in the Polk County Jail, then released, the Deputy gave her a ride back to the vehicle.

126. While Hazen was being driven back to the vehicle, she stated to the Deputy that she had pulled the vehicle over so she could go to the bathroom.

### **Hazen's Suspicious Travel in 2022 - 2023**

127. Further investigation into Hazen's activities by law enforcement showed she engaged in a pattern of suspicious travel in 2022 and 2023 consistent with the characteristics of a money courier for a drug-dealing operation, namely she flew from a drug source state (California) to other states, rented a car, and drove back to California within a short time period. Some of Hazen's known travels during this time period include the following:

| Rental Car Company | Vehicle Rented | Location and Date of Car Rental | Location and Date of Car Return |
|---|---|---|---|
| Enterprise Rental Cars | BMW X7 | Columbus, Ohio November 28, 2022 | Burbank, California December 1, 2022 |
| Enterprise Rental Cars | BMW X7 | New York, New York December 21, 2022 | Burbank, California January 4, 2023 |

| Rental Car Company | Vehicle Rented | Location and Date of Car Rental | Location and Date of Car Return |
|---|---|---|---|
| Enterprise Rental Cars | Lincoln Nautilus | Chicago, Illinois January 12, 2023 | Burbank, California January 15, 2023 |
| Enterprise Rental Cars | Volkswagen Atlas | Chicago, Illinois January 22, 2023 | San Diego, California January 24, 2023 |
| Enterprise Rental Cars | BMW X5 | Columbus, Ohio February 13, 2023 | San Diego, California February 17, 2023 |
| Enterprise Rental Cars | Nissan Rogue | Cleveland, Ohio March 6, 2023 | San Diego, California March 9, 2023 |
| Enterprise Rental Cars | Audi Q3 | Columbus, Ohio March 30, 2023 | Burbank, California April 3, 2023 |
| Enterprise Rental Cars | Hyundai Tuscon | Louisville, Kentucky May 5, 2023 | San Diego, California May 8, 2023 |
| Hertz Rental Cars | Toyota Venza | Chicago, Illinois April 11, 2023 | San Diego, California April 13, 2023 |
| Hertz Rental Cars | Chevrolet Equinox | Chicago, Illinois June 6, 2023 | San Diego, California June 11, 2023 |
| Hertz Rental Cars | Jeep Compas | Chicago, Illinois June 30, 2023 | Omaha, Nebraska July 2, 2023 |

## The Administrative Forfeiture Proceedings

128.   After the Defendant Property was seized, the DEA initiated an administrative forfeiture.

129.   On or about August 31, 2023, Hazen contested the administrative forfeiture of the Defendant Property.

130.   In the DEA Form for contesting the administrative forfeiture, Hazen still did not know the amount of the Defendant Property and estimated its total at approximately $700,000.

131.   When asked in the DEA Form for contesting an administrative forfeiture to "explain why you have a valid, good faith, and legally recognizable interest in this asset," Hazen stated she was its "sole and exclusive owner."

132.    In the DEA Form for contesting the administrative forfeiture, Hazen changed her story and claimed she "acquired said interest in the property through lawful employment and business investments," and not from a family member, a friend, the husband of a friend, or a colleague, as she previously told numerous law enforcement officers the day the Defendant Property was seized.

133.    In the DEA Form for contesting the administrative forfeiture, Hazen was asked "In the space below, please list any documents you are including in support of your interest in the asset(s). If none are included, please explain why," and she stated she would provide evidence and records after this case was filed.

## V. COUNT ONE
## (FORFEITURE UNDER 21 U.S.C. § 88l(a)(6))

134.    The United States repeats and realleges each and every allegation set forth above.

135.    The United States has reason to believe the Defendant Property constitutes moneys or other things of value furnished or intended to be furnished in exchange for a controlled substance, and/or were used or intended to be used to facilitate one or more violations of 21 U.S.C. § 841, § 843, and § 846 et seq.

136.    As a result of the foregoing, the Defendant Property is liable to forfeiture to the United States for its use in accordance with 21 U.S.C. § 88l(a)(6).

## VI. CONCLUSION

WHEREFORE, the United States respectfully requests that the Court issue a warrant and summons for the arrest and seizure of the Defendant Property; that notice of this action be given to all persons known or thought to have an interest in

or right against the property, that the Defendant Property be forfeited to the United States, and that it be awarded its costs and disbursements in this action, and such other and further relief as the Court deems proper and just under the facts and applicable law.

Respectfully submitted,

Richard D. Westphal,

United States Attorney

By: */s/Craig Peyton Gaumer*
    Craig Peyton Gaumer
    Assistant United States Attorney
    U. S. Courthouse Annex,
    Suite 286
    110 East Court Avenue
    Des Moines, Iowa 50309
    Tel: (515) 473-9300
    Fax: (515) 473-9292
    Email: craig.gaumer@usdoj.gov

## VERIFICATION

I, Gage M. Rodewald, hereby verify and declare under penalty of perjury that I am a Task Force Officer with the Drug Enforcement Administration, and that I have read the foregoing Verified Complaint in Rem, *United States v. Approximately $667,875 in U.S. Currency* and know the contents thereof and the matters contained in the Verified Complaint are true to my own knowledge, except for those matters not within my own personal knowledge and as to those matters, I believe them to be true.

The sources of my knowledge and information and the grounds for my belief are the official files and records of the United States and information provided to me by other law enforcement officers, as well as my investigation of this case, together with others, as a Task Force Officer with the U.S. Drug Enforcement Administration.

Dated: November __2__, 2023.

/s/ Gage Rodewald TFO
Gage M. Rodewald, Task Force Officer
U.S. Drug Enforcement Administration